No. 25-11394

# United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

NATHAN REIS,
*Defendant-Appellant*.

On Appeal from the United States District Court
for the Northern District of Texas (Fort Worth)
No. 4:24-CR-287-1 (Hon. Reed Charles O'Connor)

**REDACTED OPENING BRIEF FOR DEFENDANT-APPELLANT**

Roman Martinez
Kevin Andrew Chambers
Christina R. Gay
Mahshad Badii
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
roman.martinez@lw.com

April 27, 2026

*Counsel for Defendant-Appellant Nathan Reis*

# CERTIFICATE OF INTERESTED PERSONS

**No. 25-11394**

***United States of America v. Reis***

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1. **Defendant-Appellant:**

   Nathan Reis

2. **Plaintiff-Appellee:**

   United States of America

3. **Counsel for Defendant-Appellant:**

   Roman Martinez
   Kevin Andrew Chambers
   Christina R. Gay
   Mahshad Badii
   LATHAM & WATKINS LLP
   555 Eleventh Street, NW
   Suite 1000
   Washington, DC 20004

**4. Counsel for Plaintiff-Appellee:**

Jeremy R. Sanders
Appellate Counsel
UNITED STATES DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION
1400 New York Avenue, NW
Washington, DC 20005

Gail A. Hayworth
U.S. ATTORNEY'S OFFICE
NORTHERN DISTRICT OF TEXAS
1100 Commerce Street
Suite 300
Dallas, TX 75242-1074

Dated: April 27, 2026

*s/ Roman Martinez*
Roman Martinez

*Attorney of Record for*
*Defendant-Appellant Nathan Reis*

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellant respectfully submits that oral argument would materially assist the Court's disposition of this appeal. This case presents important questions about the proper methodology for calculating loss in fraud cases, as well as the limits on treating alleged co-conspirators' conduct as the "relevant conduct" for sentencing. It also involves a 120-month sentence of imprisonment.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ........................................................i

STATEMENT REGARDING ORAL ARGUMENT ........................................... iii

TABLE OF AUTHORITIES ...........................................................................vi

STATEMENT OF JURISDICTION.....................................................................1

INTRODUCTION ..............................................................................................2

STATEMENT OF THE ISSUES..........................................................................6

STATEMENT OF THE CASE.............................................................................6

A. The Paycheck Protection Program ........................................................6

B. Reis's Participation In The PPP ...........................................................8

C. Karnezis's Fraudulent PPP Scheme ....................................................11

D. Reis's Guilty Plea To $500,000 In PPP Fraud...................................14

E. The Sentencing Proceedings ...............................................................16

SUMMARY OF ARGUMENT .........................................................................22

STANDARD OF REVIEW ...............................................................................26

ARGUMENT .....................................................................................................26

I. THE DISTRICT COURT'S LOSS METHODOLOGY CANNOT WITHSTAND SCRUTINY .........................................................................27

A. The Government's Methodology Failed To Prove $66 Million In Fraudulent Loans ........................................................................28

B. The Government's Loss Figure Includes Legitimate Entitlements That Were Not Fraudulent..................................................................39

C. The Government's Loss Figure Improperly Includes Amounts That Were Repaid.......................................................................42

D. *Hebron*'s Extraordinary Burden-Shifting Framework Cannot Excuse The Government's Failures ..................................................43

**Page**

1. The District Court Did Not Apply *Hebron* ............................... 44

2. The Record Does Not Support *Hebron* In Any Event ............. 46

II. THE LOSS AMOUNT MUST ALSO BE VACATED BECAUSE IT SWEEPS IN CONDUCT FOR WHICH REIS IS NOT RESPONSIBLE ........................................................................... 49

A. The "Relevant Conduct" Inquiry Requires Individualized Attribution ............................................................................. 49

B. Karnezis's $59 Million Fraud Was Outside The Scope Of Reis's Agreement .............................................................................. 51

CONCLUSION ............................................................................................ 59

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Apprendi v. New Jersey*,
530 U.S. 466 (2000)....58

*Chandler v. City of Dallas*,
958 F.2d 85 (5th Cir. 1992)....26

*Dubern v. Girard Trust Bank*,
454 F.2d 565 (3d Cir. 1972)....45

*Molina-Martinez v. United States*,
578 U.S. 189 (2016)....27

*United States v. Adejumo*,
848 F.3d 868 (8th Cir. 2017)....29

*United States v. Antonucci*,
667 F. App’x 121 (5th Cir. 2016)....29

*United States v. Barnes*,
979 F.3d 283 (5th Cir. 2020)....45

*United States v. Bracciale*,
374 F.3d 998 (11th Cir. 2004)....29

*United States v. Bright*,
125 F.4th 97 (4th Cir. 2025)....52

*United States v. Campbell*,
765 F.3d 1291 (11th Cir. 2014)....43

*United States v. Culps*,
300 F.3d 1069 (9th Cir. 2002)....38

*United States v. Donadeo*,
910 F.3d 886 (6th Cir. 2018)....54

*United States v. Ekanem*,
555 F.3d 172 (5th Cir. 2009)....56

**Page(s)**

*United States v. Evans*,
90 F.4th 257 (4th Cir. 2024) ....................................................................50

*United States v. Evbuomwan*,
992 F.2d 70 (5th Cir. 1993) ...............................................................50, 52

*United States v. Getto*,
729 F.3d 221 (2d Cir. 2013) ....................................................................50

*United States v. Hammond*,
201 F.3d 346 (5th Cir. 1999) ..................................................26, 49, 51, 55

*United States v. Harms*,
442 F.3d 367 (5th Cir. 2006) ....................................................................40

*United States v. Harris*,
821 F.3d 589 (5th Cir. 2016) ....................................................................41

*United States v. Hebron*,
684 F.3d 554 (5th Cir. 2012) ...........................................................*passim*

*United States v. Henderson*,
58 F.3d 1145 (7th Cir. 1995) ....................................................................38

*United States v. Hess*,
106 F.4th 1011 (10th Cir. 2024) ...............................................................48

*United States v. James*,
151 F.4th 28 (2d Cir. 2025) ......................................................................29

*United States v. Kaplan*,
510 F.2d 606 (2d Cir. 1974) ....................................................................45

*United States v. Khandrius*,
613 F. App'x 4 (2d Cir. 2015) ...........................................................54, 55

*United States v. Klein*,
543 F.3d 206 (5th Cir. 2008) .............................................................26, 40

*United States v. Mahmood*,
820 F.3d 177 (5th Cir. 2016) .............................................................40, 45

**Page(s)**

*United States v. Mesquias*,
29 F.4th 276 (5th Cir. 2022) .......... 45, 48

*United States v. Mullins*,
971 F.2d 1138 (4th Cir. 1992) .......... 53

*United States v. Nelson*,
732 F.3d 504 (5th Cir. 2013) .......... 26, 29, 40

*United States v. Olis*,
429 F.3d 540 (5th Cir. 2005) .......... 26

*United States v. Ritchey*,
117 F.4th 762 (5th Cir. 2024) .......... 39

*United States v. Rostoff*,
53 F.3d 398 (1st Cir. 1995) .......... 35

*United States v. Salem*,
597 F.3d 877 (7th Cir. 2010) .......... 53, 54

*United States v. Smith*,
13 F.3d 860 (5th Cir. 1994) .......... 51

*United States v. Smith*,
174 F.3d 52 (2d Cir. 1999) .......... 50

*United States v. Spalding*,
894 F.3d 173 (5th Cir. 2018) .......... 43

*United States v. Spotted Elk*,
548 F.3d 641 (8th Cir. 2008) .......... 53, 54

*United States v. Teuschler*,
689 F.3d 397 (5th Cir. 2012) .......... 50

*United States v. Vargas*,
21 F.4th 332 (5th Cir. 2021) .......... 39

**STATUTES**

18 U.S.C. § 1343 .......... 14

**Page(s)**

18 U.S.C. § 1349 .......... 14

18 U.S.C. § 3231 .......... 1

28 U.S.C. § 1291 .......... 1

Pub. L. No. 116-136, 134 Stat. 281 (2020) .......... 6

## OTHER AUTHORITIES

SBA OIG, Rep. No. 23-09, *COVID-19 Pandemic EIDL and PPP Loan Fraud Landscape* (June 27, 2023), https://www.sba.gov/sites/default/files/2023-06/SBA%20OIG%20Report%2023-09.pdf .......... 33

U.S.S.G. § 1B1.3 .......... 5, 26

U.S.S.G. § 1B1.3(a)(1)(B) .......... 21, 25

U.S.S.G. § 1B1.3 cmt. (Background) .......... 17

U.S.S.G. § 1B1.3 cmt. n.3(B) .......... 50, 51

U.S.S.G. § 2B1.1 .......... 26

U.S.S.G. § 2B1.1(b)(1) .......... 16

U.S.S.G. § 2B1.1(b)(1)(A) .......... 28

U.S.S.G. § 2B1.1(b)(1)(C) .......... 28

U.S.S.G. § 2B1.1 cmt. (Background) .......... 16

U.S.S.G. § 2B1.1 cmt. n.3(D)(i) .......... 24, 42, 43

U.S.S.G. § 2B1.1 cmt. n.3(E)(ii) .......... 4, 20, 40, 41

William W. Wilkins, Jr. & John R. Steer, *Relevant Conduct: The Cornerstone of the Federal Sentencing Guidelines*, 41 S.C. L. Rev. 495 (1990) .......... 50

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231. That court entered final judgment on December 18, 2025. ROA.1502-06. Defendant-Appellant Nathan Reis filed a timely notice of appeal on December 29, 2025. ROA.1511-13. This Court has jurisdiction under 28 U.S.C. § 1291.

## INTRODUCTION

During the COVID-19 pandemic, Congress created the Paycheck Protection Program ("PPP")—a massive emergency effort to funnel hundreds of billions of dollars in forgivable loans to small businesses struggling to survive. The program prioritized speed over verification, and fraud inevitably followed. Nathan Reis participated in a small part of it: Between the summer of 2020 and early 2021, he helped a small circle of friends and acquaintances inflate their income on PPP loan applications to qualify for larger loans, resulting in less than $500,000 in fraudulent loans. After the government discovered this misconduct, Reis accepted responsibility and pleaded guilty.

Then came the sentencing. Although Reis had pleaded to submitting ten fraudulent loans with a principal amount of less than $500,000, the government sought to attribute *$66 million* in fraudulent loans to Reis, based on a separate conspiracy orchestrated by others. Under the Sentencing Guidelines, "loss"—the harm to the victim—drives the punishment in fraud cases. Here, the government's 130-fold increase in asserted "loss" added more than a *decade* to Reis's Guidelines range of imprisonment, shifting it from 46-57 months to 168-210 months, and massively inflating his restitution obligation. The district court accepted the government's calculation without meaningful scrutiny, sentencing Reis to 10 years' imprisonment and $66 million in restitution.

That sentence cannot stand. The government calculated a $66 million loss by treating 536 specific loans as "fraudulent" based on unreliable "fraud indicators" that neither the GAO nor the SBA Inspector General includes on their official list of PPP fraud red flags. The government deemed a loan "fraudulent" if, for example, the borrower served in the military or had an Employer Identification Number ("EIN") beginning with 85 or 86—on the theory that active-duty servicemembers were unlikely to operate side businesses and that such EINs generally, but not always, indicated the business was formed after the PPP eligibility cutoff date. For nearly half the loans in the loss amount, a single flag sufficed; the government did no further work to determine whether the loan was actually fraudulent. As for the rest, the government claimed fraud based on vaguely specified "investigative techniques," without introducing corroborating detail into the record.

The district court's decision to accept the government's back-of-the-envelope approach was reversible error. The fact that a PPP borrower served in the military or had a particular EIN does not come anywhere close to establishing—by a preponderance of the evidence—what, if any, portion of a borrower's loan was fraudulently obtained. And the government's mere invocation of vague "investigative techniques" is not remotely sufficient to prove fraud either. If the government wanted to increase Reis's "loss" amount beyond Reis's stipulated facts, it could have done so by providing credible evidence that particular loans were, in

fact, fraudulent. It did exactly that for just six of the 536 loans it relied upon in the spreadsheet. But for the other loans—comprising more than 95% of the asserted loss amount—there was no valid record evidence establishing fraud. The district court erred by sentencing Reis to a decade in prison based on the government's unproved speculative assertions.

Other methodological errors also infected the calculus. The district court adopted the government's inflated loss figure without applying the Guidelines' government-benefits rule, which requires courts to exclude amounts the borrowers were legitimately entitled to receive, regardless of any overstated income. U.S.S.G. § 2B1.1 cmt. n.3(E)(ii). Many of the loans included in the government's loss figure went to borrowers who were entitled to some PPP funds. The loss should have been the delta between what they got and what they deserved. But the government counted every dollar of every flagged loan as loss, and the district court never questioned that decision.

The district court also incorrectly assessed Reis's "relevant conduct" under the Guidelines. Of the $66 million loss amount, $59 million—nearly 90%—came from loans submitted by one person, Eric Karnezis, who ran his own separate scheme, was never mentioned in Reis's indictment, and was charged in a different case with his own co-conspirators. In other words, the government charged Reis

with one narrow conspiracy, secured a plea on that basis, and then sentenced him for another man's fraud.

The Guidelines do not permit that approach. A defendant may be sentenced based on others' conduct only if the district court finds it was within the scope of the defendant's own "jointly undertaken criminal activity" and was "reasonably foreseeable" to him. U.S.S.G. § 1B1.3. The district court made no such findings. And the theory that Reis would agree to Karnezis's scheme defies common sense: Reis had no reason to expose himself to liability for a sprawling criminal conspiracy from which he stood to gain virtually nothing—especially when he was set to earn tens of millions legitimately from his stake in Blueacorn, a company processing thousands of lawful PPP applications each day. The government's theory is implausible on its face.

If the government believed Reis was responsible for $66 million in fraud, it had a straightforward path: Charge a $66 million case and prove it. Instead, the government charged a narrow conspiracy, secured a plea to that limited conduct, and then used sentencing to impose punishment for a vastly larger amount of fraud that was either unproven or unconnected to Reis. That is not how the criminal process should work. To affirm the shortcuts taken here would be to invite the government to inflate sentences and restitution obligations through speculation alone, not proof. The law requires more. This case should be remanded for resentencing.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in adopting a loss-calculation methodology based on speculative "fraud indicators" and vaguely asserted "investigative techniques," instead of actual proof.

2. Whether the district court erred in failing to apply the Sentencing Guidelines' "government benefits" rule.

3. Whether the district court erred in counting as loss funds that Reis and others voluntarily repaid before the government detected any fraud.

4. Whether the district court erred in treating Karnezis's separate fraud scheme as Reis's "relevant conduct" for purposes of calculating loss.

## STATEMENT OF THE CASE

### A. The Paycheck Protection Program

In March 2020, the COVID-19 pandemic caused unprecedented economic turmoil in the United States, leading to business closures and soaring unemployment. In response, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020)—a roughly $2 trillion economic stimulus package. Among the CARES Act's central components was the Paycheck Protection Program ("PPP"), a loan program administered by the Small Business Administration ("SBA"). The Act authorized up to $349 billion in

SBA-backed loans to small businesses, which could be forgiven if used for payroll and certain other operating expenses. Dkt.358-3 at 3-5.[1]

To qualify for a PPP loan, a business had to have no more than 500 employees on payroll and be in operation before February 15, 2020. *Id.* at 4; Dkt.322-1 at 6. Eligible businesses could borrow up to 2.5 times their average monthly payroll costs, up to a maximum loan amount of $10 million. ROA.842; Dkt.358-3 at 4-5. For purposes of calculating payroll costs, only the first $100,000 of each employee's compensation counted, meaning the maximum loan available to a one-employee business was $20,832.50. Dkt.358-3 at 5.

The transfer of so much capital from the federal government to small business owners was unprecedented—and the SBA could not accomplish it alone. Congress therefore authorized qualified financial institutions—both traditional financial institution lenders and non-traditional institution lenders—to originate loans quickly on the government's behalf. In return, the SBA paid lenders processing fees based on loan size. ROA.1185-86.

The SBA also permitted lenders to delegate tasks such as loan origination, document collection, and loan servicing to qualified third-party vendors. These

---

[1] "Dkt." refers to documents filed under seal. The pagination refers to the PDF pagination displayed in the Pacer header.

arrangements helped alleviate the operational burden, enabling lenders to manage the high volume of loan applications. ROA.1203.

Given the urgency of the economic crisis, the PPP relied heavily on borrower self-certification of eligibility criteria, including payroll figures. Lenders were not required to independently verify this information, but only to certify that the borrower had done so. By essentially eliminating traditional underwriting and due diligence requirements, Congress accepted potentially higher levels of fraud. Demand overwhelmed the PPP almost immediately after it launched in April 2020, prompting Congress to authorize additional funding that same month and again in December 2020. Dkt.358-3 at 4-7.

Over its 14-month lifespan, the PPP's rules—including eligibility requirements—shifted repeatedly. For example, the program initially disqualified any applicant with a felony conviction from receiving PPP funds. But the SBA later narrowed the disqualification criteria to remove restrictions related to certain convictions. *Id.* at 8-10; Dkt.380-1 at 134.

**B. Reis's Participation In The PPP**

Appellant Nathan Reis is a serial entrepreneur who has launched multiple business ventures. In the years leading up to the pandemic, Reis had invested more than $4 million of his personal savings into Juuice, a portable electronic charging company. Dkt.336-1 at 3-4; Dkt.358-1 at 3. In late 2019, the company's future

looked bright. Dkt.358-1 at 2. Then COVID-19 hit—collapsing demand for the product and leaving Juuice on its last dollar. ROA.2163.

When Reis turned to the PPP for help, he encountered the same obstacles that countless small-business owners faced: Banks were prioritizing existing institutional clients with established lending relationships and larger loan amounts, leaving smaller borrowers like Reis struggling to find a willing lender. ROA.594. Seeing friends and others in his small-business community struggling with the same barriers, Reis began helping them navigate the application process, usually for a fee. Dkt.336-1 at 4. He conducted that consulting work through Juuice. *Id.*

Between July and August 2020—when the first round of PPP funding expired—Reis assisted approximately 66 borrowers with their PPP applications, nearly all of them sole proprietors or independent contractors seeking loans of the statutory maximum for self-employed individuals: $20,833. Dkt.358 at 10, 26. Reis received approximately $160,000 in borrower-paid commissions from this work. *Id.* at 10. He continued a limited amount of similar consulting during the second round of PPP funding in 2021. *Id.* at 7, 11.

Reis later admitted that ten of those applications contained materially false representations that allowed borrowers to obtain funds to which they were not entitled. ROA.1324-26. Those ten loans—for Juuice, his wife's company Body

Politix, a neighbor, and two acquaintances—totaled less than $500,000. Dkt.358 at 12.

Independent of his work assisting family and friends with PPP applications, Reis—together with his wife (Stephanie Hockridge), James Flores, and Michael Cota—co-founded Blueacorn in October 2020. *Id.* at 10. Blueacorn operated as a third-party service provider, contracting with lenders to help process small business loan applications. ROA.1196-98. In return, it received a share of the lender processing fees the SBA paid those lenders. ROA.1186-92.

Blueacorn quickly became one of the largest PPP processors in the country. At its peak, Blueacorn was receiving tens of thousands of loan applications daily. *See* Dkt.336-1 at 10. Throughout the pandemic, it helped more than 750,000 small businesses and sole proprietors obtain PPP loans. *Id*. at 4. To Reis's knowledge, Blueacorn is not under criminal scrutiny and has never been alleged to be part of any criminal conspiracy to submit fraudulent PPP applications.

Blueacorn partnered with referral sources—individuals or businesses—to bring borrowers to its platform. *Id.* One such referral source was "VIPPP," a separate business owned, managed, and operated by Hockridge. Dkt.336-1 at 4-5. VIPPP focused on providing, whether through Hockridge or one of her own independent referral agents, personalized assistance in completing the application

process. *Id.* at 5. VIPPP referred only 2,000 of the nearly 800,000 funded loans processed by Blueacorn—roughly 0.25% of the total volume. *Id.*

### C. Karnezis's Fraudulent PPP Scheme

In January 2021, Reis recruited Eric Karnezis as an independent referral agent for Blueacorn. Dkt.322-1 at 15. The two had known each other since 2010, when Karnezis was a top salesperson for Reis's separate credit-card processing company. Dkt.336-2 at 4. Reis believed that Karnezis was running a legitimate payment-processing business at the time, with small-business clients in need of PPP funds. Dkt.358 at 24-25. Karnezis later confirmed that Reis called him expecting "good, hard, honest work." Dkt.336-2 at 4.

Although Karnezis submitted loans through VIPPP, Reis occasionally provided Karnezis guidance on how to properly submit PPP applications. For instance, when Karnezis asked whether a business owner receiving unemployment would be "ineligible for PPP," Reis responded that such applications would not comply with program guidelines: "I think that's a bit of a 'no no'. Google it and see what comes up." Dkt.336-18 at 3. Reis also joked with Karnezis about the PPP's lax documentation requirements, telling him on January 7, 2021: "Basically, you can take your 17 year old niece, say she's a mobile food truck operator making $100K, gimme a draft schedule C with profits of $100K on line 31, a bank statement from February and driver's license and you've got $20K." Dkt.336 at 56.

Meantime, Karnezis went out of his way to confirm Reis's impression that his business was legitimate, texting Reis repeatedly about outreach to purportedly legitimate business contacts. *See* Dkt.336-18 at 3 (Jan. 7, 2021) ("I just called a friend and he's really excited… I have a call at 9:30am with his team …. I assume they are at least a million in payroll[.] All legit and can back it up[.]" (first omission in original)); *id.* at 5 ("I just got my first set of stips for that deal with my marketing agency. Looks like his payroll is $83k monthly[.]"); *id.* at 9 (Jan. 8, 2021) ("The flood gates are open[,] I have stips in on a lot of businesses and my phone is ringing off the hook!").

But unbeknownst to Reis, Karnezis was simultaneously orchestrating his own—much broader—fraud scheme. Rather than referring legitimate small businesses as Reis expected, Karnezis assembled a network of co-conspirators to recruit "straw borrowers" who would apply for PPP loans in exchange for a cut of the loan proceeds. Dkt.336-1 at 6-7; Dkt.358 at 25. One of Karnezis's chief accomplices was Bayless Cobb, who used the alias "Rick Diamond." Dkt.336-3; Dkt.336 at 61.

The basic scheme worked as follows: Downstream recruiters trolled social media and personal networks to recruit straw borrowers, collected their information, and funneled it to Cobb, Karnezis, or another of Karnezis's accomplices, who then prepared fraudulent applications and submitted them to VIPPP. *See* Dkts.336-3 to

336-5. Karnezis and his co-conspirators then extracted commissions of roughly one-third of the funded loans—laundered through Zelle or Venmo transactions and bank transfers to obscure the money trail. Dkt.329-5 at 21, 86-87, 110, 151-52; Dkt.358 at 28. Reis received nothing. Dkt.336-1 at 9-10; Dkt.336 at 48.

Government interviews of Karnezis's downstream co-conspirators confirm that they neither knew Reis nor received direction from him. *See* Dkt.336 at 27. In interviews with Cobb and other co-conspirators, the government elicited detailed accounts of Karnezis's scheme—none mentioning Reis. *Id.* at 27 n.37. One recruit explained that Karnezis and Cobb "were the people above him that were running 'whatever was going on,'" and that "either [Karnezis] or [Cobb] was the banker who push[ed] the loans through." Dkt.336-3 at 7. And when Cobb himself was asked whether "the name Nathan Reis rings a bell," he answered no. Dkt.336-1 at 8 n.11.

Throughout this period, Karnezis repeatedly lied to Reis and Hockridge about the legitimacy of his VIPPP referrals. For example, on January 7, 2021, Karnezis assured Reis by text that his referrals were "[a]ll legit and can back it up." Dkt.358-12 at 8. When Hockridge later raised concerns that Cobb might be a scammer, Karnezis responded, "'he's a clean cut white boy from a wealthy family that owns a successful mortgage brokerage. 100% did not see this coming.'" Dkt.336-1 at 8 n.8. Karnezis later admitted that this was an example of "'[him] lying to the [VIPPP] team.'" *Id.* And he has further admitted that he will say whatever is necessary to

"'talk [his] way out'" of trouble, even if it requires lying under oath or to federal officials. *Id.* at 8.

In August 2023, Karnezis was separately indicted in the District of Oregon for his PPP fraud scheme. Dkt.322-1 at 15. His indictment made no mention of Reis. Dkt.336 at 53. Karnezis later pleaded guilty and has cooperated with the government as a witness in this case. Dkt.336-1 at 3. He has admitted his cooperation is motivated by the hope of securing a lower sentence for himself; he otherwise faces 380 years' imprisonment. ROA.2050:2-56:17. Karnezis's sentencing is scheduled for June 2026. Dkt.109, *United States v. Karnezis*, No. 3:23-CR-067-IM (D. Or. Aug. 18, 2025).

**D. Reis's Guilty Plea To $500,000 In PPP Fraud**

In November 2024, Reis and Hockridge were indicted on one count of conspiracy to commit wire fraud and four counts of wire fraud. ROA.27-37 (citing 18 U.S.C. §§ 1343, 1349). The indictment alleged that, beginning in April 2020, Reis and Hockridge submitted, or caused to be submitted, PPP loan applications containing material misrepresentations to induce lenders and the SBA to approve loans in amounts the borrowers were not eligible to receive. *Id.* It identified ten specific loans arising from Reis's one-on-one consulting work through Juuice—on behalf of his and Hockridge's companies and friends and acquaintances—totaling less than $500,000. ROA.33-36. The indictment did not mention Karnezis.

In April 2025, Reis and Hockridge's cases were severed. ROA.784. Hockridge proceeded to trial and, in June 2025, was acquitted of the wire-fraud charges but convicted of one count of conspiracy to commit wire fraud. ROA.1083. At that trial, Karnezis—the government's key witness—admitted that he had repeatedly lied to federal agents, including about his knowledge of fraud within his own downstream network. Dkt.336-1 at 7-8; Dkt.380 at 15; ROA.1918:1-23. Karnezis also "estimate[d]" that "90 percent" of his pipeline consisted of fraudulent loans. ROA.1940:11-20.

On August 6, 2025, Reis pleaded guilty to a single count of conspiracy to commit wire fraud. ROA.2447. As part of his plea, Reis submitted a factual resume setting forth the specific conduct to which he admitted. ROA.1324-27.

That submission was narrow. The factual resume explained that Reis had submitted ten PPP applications containing materially false statements, totaling less than $500,000 in loan principal. ROA.1325-26. Those applications arose from his personal consulting work through Juuice, and the borrowers were three acquaintances plus Reis and Hockridge's companies. *Id.*

Reis's plea agreement provided that he "agrees to pay[] restitution for all loss resulting from the offense of conviction and all relevant conduct." ROA.2451. It also preserved his right to appeal "the loss amount determined by the Court for

purposes of USSG § 2B1.1(b) … if the Court finds that it exceeds $3,500,000." ROA.2453.

### E. The Sentencing Proceedings

1. In fraud cases, the "loss amount"—the monetary harm caused or intended by the defendant's conduct—is a "principal factor in determining [a defendant's] offense level," which, together with criminal history, determines the advisory sentencing range. U.S.S.G. § 2B1.1 cmt. (Background). The Sentencing Guidelines impose graduated offense-level increases based on loss: +12 levels for loss exceeding $250,000; +18 levels for loss exceeding $3.5 million; and +24 levels for loss exceeding $65 million. U.S.S.G. § 2B1.1(b)(1).

These offense-level increases have dramatic consequences. A first-time offender who caused a $65 million loss faces an advisory Guidelines range of 210-262 months' imprisonment, whereas the same defendant with a loss of less than $550,000 faces a Guidelines range of only 41-51 months. *Id.*

2. In September 2025, the government provided Reis with an updated Excel spreadsheet (the "Loss Spreadsheet") that it claimed supported attributing to him a total loss of $66 million. Dkt.411-1.[2] Although Reis's indictment and factual

[2] The electronic record on appeal includes a PDF version of this spreadsheet, which is difficult to read due to small print. The native Excel file was admitted into evidence in the district court (via thumbdrive) and remains available there, *see* Dkt.411; the Court may wish to consult that version for ease of review.

resume identified only ten fraudulent loans totaling less than $500,000, the spreadsheet listed 536 purportedly fraudulent loans as Reis's "relevant conduct," yielding the $66 million total. *Id.*[3] The Loss Spreadsheet categorized those loans into four groups: (1) "Round 1 Analysis" loans, purportedly submitted by Reis on behalf of himself and acquaintances; (2) "Other Round 2 Analysis" loans, similar in nature but submitted during Round 2; (3) "VIPPP" loans routed through the VIPPP referral channel; and (4) "ZTG" loans submitted by Zack Smith—a referral agent recruited by Flores and Cota—to Blueacorn through Flores and Cota's "QWK" pipeline. *Id.*; Dkt.380-1 at 153. An excerpt of the spreadsheet, with certain columns omitted to improve readability, appears below.

| SALESFORCE_SBA_NUMBER | FIRST_NAME | LAST_NAME | LOAN_AMOUNT | CATEGORY | | | |
|---|---|---|---|---|---|---|---|
| | | | | 85-86 EIN | Criminal History | Military History | Investigative Techniques |
| [redacted] | [redacted] | [redacted] | $145,000.00 | | | Military History | |
| | | | $144,995.00 | 85-86 EIN | | | |
| | | | $144,732.00 | 85-86 EIN | | | |
| | | | $144,727.00 | 85-86 EIN | | | Investigative Techniques |
| | | | $144,712.00 | 85-86 EIN | | | |

Dkt.411-1 at 11.

The overwhelming majority of loans the government counted as loss—390 loans totaling $62 million—derived from the VIPPP channel. And the vast majority of that amount traced to one person: Eric Karnezis. Karnezis's pipeline accounted for 313 of the flagged loans, totaling almost $59 million. Dkt.380-1 at 118. Indeed,

[3] "Relevant conduct" is "the range of conduct that is relevant to determining the applicable offense level" under the Guidelines. U.S.S.G. § 1B1.3 cmt. (Background).

Karnezis's pipeline accounted for every seven-figure loan and nearly every six-figure loan in the spreadsheet. Dkt.380 at 15 n.23.

Notably, the government did not claim that it investigated each loan before labeling it fraudulent and including it in its $66 million calculation. Instead, it included many loans based solely on one or more "fraud indicators"—without even identifying the universe of loans to which those indicators were applied. Dkt.411-1.

The first "indicator" flagged loans where the borrower's Employer Identification Number ("EIN") began with 85 or 86—which the government claimed showed the business was formed after February 15, 2020 (the PPP eligibility cutoff). Dkt.358 at 18. The second "indicator" flagged loans submitted by individuals with a "military history," on the theory that it was "improbable" active-duty U.S. military servicemembers would operate side businesses. *Id.* And the third "indicator" flagged loans submitted by borrowers with any "criminal history," based on the premise that criminal convictions generally disqualified applicants from PPP eligibility. *Id.* at 19.

The government's spreadsheet also included an additional "Investigative Techniques" tab, purporting to identify investigative steps it took for 273 of the 536 loans listed as fraudulent in the spreadsheet. Dkt.380-1 at 160. For the remaining 263 loans, the spreadsheet labeled them fraudulent based solely on one or more of

the "indicators." *Id.* So, in total, the indicator-only review represented approximately $23 million in loss. *Id.*

Even for the 273 loans the government claimed to have "investigated," its efforts were minimal. The government claimed to have reviewed bank records for just six loans and payroll for only two. *Id.* at 184.

The government's spreadsheet drew no distinction between wholly fictitious loan applications—where the borrower did not exist or was otherwise ineligible for any PPP funds—and inflated applications where a real borrower qualified for some PPP funds but received more than warranted. The government simply tallied the full principal of every flagged loan—without offsetting any amounts legitimate borrowers were legitimately entitled to receive.

3. On September 30, 2025, the Probation Office issued Reis's Presentence Investigation Report ("PSR"). Dkt.322-1. The PSR adopted the government's $66 million spreadsheet-based loss calculation in full. *Id.* at 21. Based on this inflated loss figure, the PSR applied a 24-level increase under U.S.S.G. § 2B1.1(b)(1), resulting in an advisory Guidelines range of 210-240 months' imprisonment. *Id.* at 23, 30.

Reis objected. He first challenged the loss methodology as "inherently flawed," arguing the government "based a considerable portion of its loss

quantification on potential red flags for fraud—but *without* a finding of fraud itself." Dkt.336 at 8, 74.

Three experts agreed. Among them was James Appelbaum, a retired FBI Senior Financial Investigator with over 35 years' experience, who found the government's fraud indicators "not reasonabl[y] reliable" and noted that the government could have readily used standard investigative techniques—interviewing borrowers and reviewing tax returns and bank records—to actually identify fraud, but chose not to. Dkt.380-1 at 4-5; *see* Dkt.358-3 at 15-17 (similar testimony from former executive director of congressionally established U.S. Pandemic Response Accountability Committee); *see also* Dkt.358-4.

Reis further argued that the loss calculation improperly included the full principal of loans to borrowers who were legitimately entitled to receive some portion of those funds, contrary to the Guidelines' "government benefits" rule. Dkt.336 at 13. That rule limits loss in government-benefits cases to the excess benefit fraudulently obtained rather than the total amount disbursed. U.S.S.G. § 2B1.1 cmt. n.3(E)(ii).

Reis also objected to the PSR's inclusion of Karnezis's separate fraud as his "relevant conduct." Dkt.336 at 12-13. Under the Guidelines, a defendant can be sentenced based on others' conduct only if it was (1) within the scope of jointly undertaken criminal activity, (2) in furtherance of that activity, and (3) reasonably

foreseeable to the defendant. U.S.S.G. § 1B1.3(a)(1)(B). Reis argued that Karnezis's $59 million fraud was neither known to him nor within the scope of any joint undertaking because, among other reasons, the two operated entirely different schemes. Dkt.336 at 15-16, 63.

On November 26, 2025, the Probation Office issued an Addendum to the PSR. Dkt.366. Rather than engage with Reis's methodological objections, the Addendum simply asserted that "[t]he loss amount was calculated using a myriad of methods to determine which applications were likely fraudulent." *Id.* at 3. It also noted that, "[g]iven the blatantly fraudulent activity" of agents like Karnezis, and Blueacorn's role in "assist[ing] in filing applications which funded over $11 billion in disbursements," the $66 million loss amount is "likely a conservative estimate." *Id.*

As for relevant conduct, the Addendum offered only that Reis and Karnezis had "join[ed] into a conspiracy" because Reis allegedly "trained Karnezis on how to commit the fraud" and was "aware of the rampant fraud being committed through Blueacorn." *Id.* It further asserted that Reis "engaged in a jointly undertaken conspiracy to file fraudulent PPP loans with the goal of receiving the maximum disbursement allowable, whether the applicant was eligible or not." *Id.* at 4.

On December 10, 2025, Reis objected to the Addendum, Dkt.380, renewing his challenges to the loss calculation and seeking to call Karnezis as a witness at

sentencing to establish that his separate fraud "should not be considered relevant conduct," ROA.1474.

4. On December 16, 2025—two days before sentencing—the district court issued a six-page order denying the majority of Reis's 100-plus pages of objections. Dkt.385. Its analysis of the $66 million loss calculation—which drove a 24-level enhancement and, with it, a Guidelines range of 168-210 months—consisted of a single sentence: "[T]he PSR's loss calculation only holds Defendant accountable as to the losses that fall within the definition of § 1B1.3(a)(1)(B) and § 2B1.1 cmt. 3(C)(i) and is based on reliable information." *Id.* at 2-3. The court also denied Reis's request to examine Karnezis at sentencing, characterizing it as "cumulative and repetitive" of evidence already presented. *Id.* at 2 & n.6. At the sentencing hearing, however, it noted that "Karnezis clearly has credibility issues." ROA.1769.

The district court then sentenced Reis to 120 months' imprisonment and ordered restitution of $66,038,049.27. ROA.1502-06. Reis is jointly and severally liable with Hockridge, Flores, and Eric and Anthony Karnezis for $63,952,063.64 of that amount. ROA.1505.

## SUMMARY OF ARGUMENT

The district court made four crucial errors in adopting a $66 million loss figure that drove Reis's 120-month sentence and $66 million restitution obligation. This Court should vacate and remand for resentencing under the proper approach.

**I.** The $66 million figure is built on three methodological errors—each of which allowed the government to sidestep its burden of actually proving fraud by a preponderance of the evidence. The district court failed even to address those errors, instead rubberstamping the government's $66 million loss figure without analysis.

*First*, the government deemed loans "fraudulent" based on crude statistical proxies—the first few digits of a borrower's tax ID, military service, or criminal history—and vague "investigative techniques" it never adequately specified. But this Court and others require loss methodologies to rest on specific evidence that reliably links a particular transaction to fraud, not blunt assumptions drawn from unreliable proxies or unspecified methods. The government's indicators do not even appear on the GAO or SBA Inspector General's own lists of PPP fraud red flags—and those agencies make clear that even their more carefully calibrated indicators are *not* proof of fraud, but triggers for further investigation. Cruder proxies cannot possibly carry the government's burden. Nor can "investigative techniques" the government will not describe. The government's methodology was woefully insufficient to prove fraud.

*Second*, the district court ignored the Guidelines' government-benefits rule. That rule exists to prevent the government from counting as "loss" money borrowers were legitimately entitled to receive. Many of the loans in the government's spreadsheet went to borrowers who legitimately qualified for some PPP funds. The

"loss" attributable to Reis's fraud should have been the difference between what they got and what they deserved. Instead, the government counted every dollar of every flagged loan as loss—and the district court never questioned that decision. That was reversible error.

*Third*, the government counted as loss certain amounts that borrowers voluntarily repaid before any fraud was even detected—even though the Guidelines require such repayments to be credited against loss. *See* U.S.S.G. § 2B1.1 cmt. n.3(D)(i). The result of these cascading errors is a loss figure untethered from proof—and a sentence and restitution obligation grossly disproportionate to any fraud Reis actually committed.

Below, the government offered alternative theories for calculating loss, including the Court's decision in *United States v. Hebron*, 684 F.3d 554, 563 (5th Cir. 2012)—which permits the government, in exceptional cases, to treat an *entire* universe of claims as loss—and Karnezis's claim that "90%" of *his* $100 million in funded loans were fraudulent. But the district court relied on neither theory, instead adopting the $66 million loss figure from the government's spreadsheet. Regardless, *Hebron* does not apply here, and Karnezis's "90%" figure is unreliable by any measure.

**II.** The district court committed a separate, fundamental error in treating Karnezis's $59 million fraud as Reis's "relevant conduct" for sentencing—and thus including those losses in the loss calculation.

Under the Guidelines, a defendant may be sentenced for another's conduct only if the district court finds that conduct fell within the scope of the defendant's own joint undertaking and was reasonably foreseeable to him. U.S.S.G. § 1B1.3(a)(1)(B). The district court made no such findings as to Karnezis's conduct. And the record would not support them anyway. Karnezis was separately indicted in Oregon alongside co-conspirators who had never heard of Reis. And his scheme bore little resemblance to Reis's: Where Reis generally helped acquaintances get $20,000 loans by inflating their income, Karnezis recruited strangers as straw borrowers, fabricated entire corporate payrolls out of whole cloth, and obtained loans in the hundreds of thousands—sometimes millions—of dollars.

The theory also defies common sense. At the time of Karnezis's fraud, Reis stood to earn tens of millions from his stake in Blueacorn—a legitimate company never alleged to have participated in any criminal conspiracy to submit fraudulent PPP applications. It makes no sense that Reis would risk that upside for loans representing less than 0.25% of Blueacorn's total volume. The district court's decision to treat Karnezis's fraud as Reis's relevant conduct for purposes of the loss calculation—without grappling with any of these points—cannot stand.

The Court should vacate the judgment.

## STANDARD OF REVIEW

The Court reviews the district court's "application of the [G]uidelines *de novo*." *United States v. Klein*, 543 F.3d 206, 213-14 (5th Cir. 2008). That includes the district court's application of the loss-calculation guideline, U.S.S.G. § 2B1.1, *see United States v. Nelson*, 732 F.3d 504, 520 (5th Cir. 2013), and the "relevant conduct" guideline, U.S.S.G. § 1B1.3, *see United States v. Hammond*, 201 F.3d 346, 351 (5th Cir. 1999).

Although a district court need only make a "'reasonable estimate of loss,'" *United States v. Olis*, 429 F.3d 540, 545 (5th Cir. 2005), this Court "review[s] the district court's *method* of determining the amount of loss … *de novo*," *Nelson*, 732 F.3d at 520; *see Klein*, 543 F.3d at 214. And while factual findings are ordinarily reviewed for clear error, that standard presupposes findings exist. "[A] district court's failure to detail its findings … negates [this Court's] ability to apply the clearly erroneous standard of review." *Chandler v. City of Dallas*, 958 F.2d 85, 89 (5th Cir. 1992).

## ARGUMENT

The government charged—and secured a plea to—a $500,000 fraud. It then asked the district court to sentence Reis as if the fraud was for *$66 million*. That 130-fold leap rested not on actual evidence, but on broad assumptions and shortcuts.

The district court's decision to accept those shortcuts was clear error. The government's loss methodology is fundamentally flawed in multiple respects. And most of the conduct underlying that loss amount does not qualify as relevant conduct for Reis regardless.

The prejudice here is stark. Reis's admitted $500,000 loss would yield a Guidelines range of 46-57 months (or four to five years)—not the 168-210 months (or 14 to 18 years) range the district court used. Any error that inflates the Guidelines range is presumptively prejudicial. *See Molina-Martinez v. United States*, 578 U.S. 189, 198 (2016). All the more so here, where the district court sentenced Reis to ten years—nearly *double* the top of the proper range for the conduct he admitted. And the harm extends beyond imprisonment: The same inflated loss figure drove the $66 million restitution order. Vacatur and resentencing is warranted.

## I. THE DISTRICT COURT'S LOSS METHODOLOGY CANNOT WITHSTAND SCRUTINY

The district court's $66 million loss figure rests on three fundamental methodological errors: (1) it relied on the government's unreliable fraud "indicators" and undefined "investigative techniques" instead of actual proof of fraud; (2) it ignored the Guidelines' government-benefits rule requiring offsets for legitimate entitlements; and (3) it failed to credit voluntary repayments. And this Court's decision in *United States v. Hebron*, 684 F.3d 554 (5th Cir. 2012), provides no refuge here.

### A. The Government's Methodology Failed To Prove $66 Million In Fraudulent Loans

Before counting a loan in the loss figure, the government bore the burden of proving by a preponderance of evidence that it was actually fraudulent. The district court thus had to decide what methodology could lawfully carry that burden. Among the methods the government proposed was a two-part approach embodied in its Loss Spreadsheet, which relied on categorical fraud "indicators" and vague "investigative techniques" to treat loans as fraudulent without further examining the legitimacy of the underlying applications. That approach produced a $66 million loss figure. The district court adopted that figure down to the dollar—and with it, the underlying two-part method.

That was error. Reis offered unrebutted expert testimony that the government's indicators were unreliable screening tools prone to false positives, and he identified the only dependable method for establishing fraud in this context: Examine the flagged loans themselves by comparing applications to tax returns, subpoenaing bank records, and interviewing the borrower where appropriate. The government never disputed that those tools were available here. Yet the court relied on the very methodology Reis discredited, producing a loss calculation totally unsupported by credible evidence.

1. In fraud cases, "loss" is the greater of either the actual loss sustained by the victim or the loss the defendant intended to inflict. U.S.S.G. § 2B1.1(b)(1)(A),

(C). Although a district court need only make a "'*reasonable* estimate'" of loss, *United States v. Nelson*, 732 F.3d 504, 520 (5th Cir. 2013), that estimate must rest on "'reliable and specific evidence'"—not "'speculat[ion]'" or error-prone proxies, *United States v. Bracciale*, 374 F.3d 998, 1003 (11th Cir. 2004).

This Court and others have not hesitated to vacate loss figures resting on flawed methodologies and unreliable proxies. *See, e.g.*, *United States v. James*, 151 F.4th 28, 49-50 (2d Cir. 2025) (vacating loss figure built on assumption that every insurance claim submitted under particular billing code was fraudulent); *United States v. Adejumo*, 848 F.3d 868, 871 (8th Cir. 2017) (vacating where government relied solely on victims' loss estimates without further investigation); *United States v. Antonucci*, 667 F. App'x 121, 124-25 (5th Cir. 2016) (rejecting "impermissible methodology" treating company-policy violations as fraud proxies).

This case calls for the same result. Here, the government treated hundreds of loans as fraudulent simply because the borrower's EIN began with 85 or 86, he served in the military, or he had a criminal record—without further verifying that those loans were *actually* fraudulent. But each of these "indicators" is uniquely unreliable and prone to false positives. *See* Dkt.380-1 (detailing issues with government's indicators). And the record below is devoid of any evidence that these indicators establish fraud.

Start with EINs. The government's premise—that an EIN beginning with 85 or 86 means the business was created after February 2020—is simply wrong. The first two digits of an EIN historically correspond to which IRS campus processed the application, *not* when the business was created. *Id.* at 162-66. Moreover, sole proprietors and independent contractors are not required to have an EIN *at all*—they may use their Social Security number, so a business could have operated for years before obtaining one. Dkt.358-3 at 15-16. A sample review by FTI Consulting confirmed as much: at least four of sixteen loans flagged under this indicator were associated with businesses registered *before* February 2020. Dkt.358-4 at 9. Even excluding loans where the government also claimed to have used "investigative techniques," the EIN indicator added *$16.6 million* to Reis's loss figure. Dkt.380-1 at 161.

James Appelbaum, a former federal investigator who worked on PPP fraud investigations, identified numerous loans flagged under this indicator that were in fact made to legitimate businesses operating before February 2020—many with no connection to Karnezis. *Id.* at 166. For example, the government labeled two loans totaling $323,000 to the "[redacted]" as fraudulent based solely on the company's EIN. *Id.* Yet a simple Internet search shows that business had customer reviews dating back to 2017. *Id.* at 166-67. And this is not an isolated case. *See id.* at 168-174 (providing more examples of borrowers incorrectly labeled as fraudsters

based on their EINs). A basic Internet search could have revealed these false positives; the government did not bother.

The military-service indicator is even worse—it captures the very borrowers Congress *intended to help* through the PPP. The Act contained a "Sense of the Senate" provision urging the SBA to ensure disbursement of PPP loans prioritized "veterans *and members of the military community*." Dkt.358-3 at 4 (emphasis added). The government speculates that servicemembers likely lacked command approval to run side businesses, but it has admitted that it "did not check to see whether they had approval." Dkt.329-8 at 11. Had it checked, it would have found that military side businesses are commonplace: 54% of active servicemembers work as self-employed freelancers or in the gig economy. Dkt.358-3 at 16. And a sample review of loans flagged solely for military service revealed that three of four were associated with legitimate businesses that existed before February 2020. Dkt.358-4 at 10. Excluding loans where the government also claimed to have used "investigative techniques," the military-history indicator added $9 million to Reis's loss. Dkt.380-1 at 179.

The criminal history indicator is no better. PPP eligibility rules changed over time—the March 2021 update removed restrictions on certain non-financial felonies, yet the government never checked whether any flagged borrower's conviction disqualified them under the rules in effect at the time. Dkt.329-8 at 13-14; Dkt.380-

1 at 180. An applicant with a drug conviction, for example, would have been ineligible in Round 1 but eligible in Round 2. The government did none of the work to distinguish between the two. This faulty indicator added $3.5 million to Reis's loss. Dkt.380-1 at 180.

More generally, a fraud-indicator-based approach is almost never sufficient to actually prove fraud—even when the indicators are well-founded, which they are not here. Undisputed expert evidence below showed that while "determining the extent of fraud in a large data set of loans may *begin* with fraud indicators," "significant advanced data analysis, document reviews, and investigative shoe leather is necessary to eliminate false positives and establish actual losses." Dkt.358-3 at 17 (emphasis added).

The very agencies responsible for PPP oversight say the same thing. The GAO has developed its own set of PPP fraud "indicators"—yet none involves EINs, criminal history, or any factor the government relied on here. *Id.* at 14-15. And the GAO has been clear that even its own indicators "aren't proof of fraud," and instead serve only as starting points for "'further review and possible law enforcement investigation.'" *Id.* at 14.

The SBA's Office of Inspector General likewise maintains its own list of PPP fraud "indicators," *see id.*—and its treatment of EIN prefixes is telling. While OIG flagged loans with EINs beginning with 85-86 as a potential indicator of post-cutoff

business formation, it recognized the limits of that proxy: OIG *excluded* sole proprietors and independent contractors from that analysis entirely "because those businesses could have been in operation for some time before the cutoff date" and only later obtained an EIN.[4] And even for that more carefully calibrated EIN indicator, OIG made clear that flagged loans were only "'potentially fraudulent'" and "'*warrant investigation*.'" *Id.* The SBA has further found that such flagged loans "include a high percentage of false positives." *Id.* at 15.

By treating indicators as endpoints rather than starting points—and by ignoring the very exclusions the SBA's OIG recognized were necessary—the government skipped the further investigation that its own methodology demands to prove fraud.

2. For 273 of the 536 loans in its $66 million figure, the government claimed to have applied "investigative techniques" before counting a loan as loss. Dkt.380-1 at 182. But those techniques were so minimal and so poorly documented that it is impossible to verify what the government actually did. And whatever evidence they supposedly generated was not clearly explained or put in the record by the government. *Id.* at 4, 194.

---

[4] SBA OIG, Rep. No. 23-09, *COVID-19 Pandemic EIDL and PPP Loan Fraud Landscape* 14 (June 27, 2023), https://www.sba.gov/sites/default/files/2023-06/SBA%20OIG%20Report%2023-09.pdf.

The government claimed to have reviewed bank records for just *six* of the 536 loans on the spreadsheet, providing notes indicating why it deemed those particular loans fraudulent. *Id.* at 184. But for the rest, the listed "investigative techniques" are hopelessly vague—consisting largely of a label that the loan was deemed fraudulent by a "cooperator's proffer," with no identification of the "cooperator," no description of what was said, and no connection to any particular loan or borrower. *Id.* at 187-88. Indeed, for many loans, it was "not possible to tell what evidence the government relied upon." *Id.* at 194 (expert summarizing problems with government's "techniques").

Take just one example: a $1.1 million loan to [redacted], labeled fraudulent based only on the vague "cooperator proffer" notation. Dkt.411-1 at 15. That is it. That single notation tells Reis nothing—no indication of who the cooperator was, what the cooperator said, whether the cooperator mentioned this loan at all, or why it would be fraudulent. How could Reis possibly rebut including this loan as loss? And how could the court treat this as dispositive evidence that the [redacted] loan was fraudulent? The below excerpt shows the information recorded in the spreadsheet as to this allegedly fraudulent loan.

| LOAN INFORMATION | | | LOAN ANALYSIS |
|---|---|---|---|
| SBA LOAN # | PRIMARY BORROWER | LOAN AMOUNT | MOI(s)/302(s) |
| [redacted] | [redacted] | $ 1,085,355.00 | Cooperator Proffer |

*Id.*

The government's vague investigative "techniques" are not proof of fraud—they are the absence of proof, dressed up in a spreadsheet. That cannot possibly carry the government's burden. There is no basis for increasing Reis's sentence—and forcing him to pay tens of millions in restitution—based on this sort of purported "evidence."

3. The unrebutted expert testimony below confirms exactly what real proof of fraud looks like in PPP cases. "Reliable evidence to support a claim of fraud" in this context "ordinarily include[s] bank records, payroll documentation, tax records, and borrower interviews." Dkt.380-1 at 3. In practice, that means "obtaining and reviewing the entire loan file from the lender, … obtaining and reviewing IRS records" and "bank records to verify business existence and trace use of loan funds," and, if necessary, "interviewing witnesses … and interviewing the subject." Dkt.358-3 at 15. These are critical "categories of documentation" that are "central to determining whether losses alleged by the Government were in fact suffered." Dkt.358-4 at 6-7; *see* Dkt.358-3 at 6.

Indeed, that is how the government proves fraud in other cases—and how it has proven PPP fraud specifically. Dkt.380-1 at 38-39; *see, e.g.*, *United States v. Rostoff*, 53 F.3d 398, 407 (1st Cir. 1995) (government limited loss to loans with "specific evidence of fraud" based on bank-record review). The government did

exactly that for six loans it counted as loss in the spreadsheet, pulling bank records and explaining why those particular loans were fraudulent. *Supra* 34.

Appelbaum confirmed the shortcomings of the government's approach here, noting that "typically the first thing we did [when investigating PPP fraud for the FBI] was subpoena the bank records" to verify whether claimed payroll was real. Dkt.380-1 at 38. He was "surprised" the government chose to do so for only a handful of loans here. *Id.* at 39.

The government's methodology for identifying fraudulent loans here does not come close to satisfying due process (or common sense). In no other area of law would a court accept faulty indicators or vague references to "investigative techniques" as sufficient proof of fraud. Yet on the government's theory that such evidence suffices, it could bring civil fraud claims against any military servicemember who received PPP funds and rest entirely on that fact—effectively forcing the defendant to *disprove* fraud. Or it could deem taxpayers with unusually high deductions guilty of tax fraud based on statistics alone, without proving a misstatement. The law does not allow that. Yet that is precisely the kind of shortcut the government took here—and in the criminal sentencing context, where the consequences are particularly severe. The district court erred in accepting it.

4. The district court's entire analysis of the loss amount consisted of a single sentence: "[T]he PSR's [$66 million] loss calculation only holds Defendant

accountable as to the losses that fall within the definition of § 1B1.3(a)(1)(B) and § 2B1.1 cmt. 3(C)(i) and is based on reliable information." Dkt.385 at 2-3. The court did not address Reis's objections, grapple with the unrebutted expert evidence, or explain how a methodology that the GAO and SBA themselves say cannot prove fraud could somehow carry the government's burden to prove loss.

The PSR offered nothing more. It adopted the government's Loss Spreadsheet wholesale, without engaging with Reis's arguments. *See generally* Dkt.322-1. And the PSR Addendum added only the conclusory boilerplate that "the loss amount was calculated using a myriad of methods to determine which applications were likely fraudulent." Dkt.366 at 3. It never explained why this assumption-based analysis could actually prove fraud in the face of unrebutted expert testimony establishing the flaws inherent in those assumptions.

The Addendum ultimately retreated to a fallback: $66 million was "likely a conservative estimate" because Karnezis testified at the guilt-phase of Hockridge's trial that "over 90 percent" of his roughly $100 million in loans submitted through VIPPP were fraudulent, and Blueacorn facilitated $11 billion in total PPP disbursements. *Id.* But this "conservative estimate" theory cannot support the loss figure.

Most importantly, the district court adopted a $66 million loss figure—the exact total generated by the Loss Spreadsheet, which was based on the government's

fraud "indicators" and vague "investigative techniques." Had the court instead relied on Karnezis's "90 percent" estimate to establish loss, the loss figure would have been $90 million (90% of his $100 million pipeline). The fact the court adopted the spreadsheet's precise total confirms that it relied on the methodology embodied in the spreadsheet instead. And in any event, as explained below, Karnezis's $59 million fraud does not qualify as Reis's "relevant conduct" under the Guidelines—which means using the size of *Karnezis*'s fraud to set *Reis*'s loss makes no sense. *See infra* Part II.

Blueacorn's $11 billion in total disbursements is equally irrelevant. Had the company's total volume driven the district court's analysis, the loss figure would have been far higher—and it would not mirror the calculation from the spreadsheet down to the penny. That shows volume played no role. And it should not have: Blueacorn was a legitimate company and has not been charged with criminal wrongdoing. *Supra* 10.

Nor can the district court "overcome the absence of evidence [for sentencing purposes]" simply by adopting the PSR's purported "conservative estimate" of fraud. *United States v. Culps*, 300 F.3d 1069, 1079 n.5 (9th Cir. 2002); *see, e.g.*, *United States v. Henderson*, 58 F.3d 1145, 1152 (7th Cir. 1995) (court cannot "choose a random number simply because it believe[s]" the number is conservative). The government had to prove the amount of loss by a preponderance. It cannot meet

that burden by invoking unreliable testimony from a separate conspiracy's mastermind, applying an arbitrary discount factor, labeling the result "conservative," and calling it a day.

In *United States v. Ritchey*, this Court reversed a loss methodology that "diverge[d] from economic realism," contained no "'economic analysis,'" and substituted assumptions for proof. 117 F.4th 762, 766-67 (5th Cir. 2024). The same result follows here. The government had every tool it needed to verify fraud loan by loan—and chose unreliable shortcuts instead. The district court's decision to let it skip that work was error.

### B. The Government's Loss Figure Includes Legitimate Entitlements That Were Not Fraudulent

The district court's methodological errors do not end there. The loss figure it adopted swept in PPP funds that borrowers were legitimately entitled to receive, even if their income was inflated to receive more. In other words, the loss calculation made no distinction between wholly fabricated loan applications and merely inflated ones. The result is a loss calculation even further untethered from actual fraud—and a sentence and restitution obligation grossly disproportionate to the conduct at issue. The Guidelines prevent exactly this kind of overcounting.

1. In cases involving "government benefits," the Guidelines establish a "'special rule'" to prevent overcounting. *United States v. Vargas*, 21 F.4th 332, 335 (5th Cir. 2021). That rule provides:

> In a case involving government benefits (e.g., grants, loans, entitlement program payments), loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be. For example, if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50.

U.S.S.G. § 2B1.1 cmt. n.3(E)(ii). As this Court has explained, "a defendant should not be held accountable for the total amount of benefits obtained, when some portion of that benefit would have been obtained absent the fraudulent conduct." *Nelson*, 732 F.3d at 521.

The logic of this government-benefits rule is straightforward: Government benefits that went to "'[]intended recipients or diverted to []intended uses'" are not "'loss'" at all. *United States v. Harms*, 442 F.3d 367, 380 (5th Cir. 2006). The proper loss calculation is therefore "'the difference between the amount the defendant actually received and the amount he would have received absent the fraud'—in other words, 'the amount of loss based on the amount of *excess* benefits received as a result of fraud.'" *Nelson*, 732 F.3d at 521.

In case after case, this Court has reversed district courts that calculated loss as the total value of government benefits received rather than only the portion that was fraudulently obtained. *See, e.g.*, *United States v. Mahmood*, 820 F.3d 177, 195 (5th Cir. 2016) (healthcare fraud); *United States v. Klein*, 543 F.3d 206, 215 (5th Cir. 2008) (healthcare fraud); *Harms*, 442 F.3d at 379 (mail fraud).

2. The government benefits rule plainly applies to this case. The Guidelines commentary explains that the rule covers "grants, *loans*, entitlement program payments, or other government benefits." U.S.S.G. § 2B1.1 cmt. n.3(E)(ii) (emphasis added). And this Court has concluded that a program qualifies when it involves a "unilateral transfer" of funds that "exist primarily to benefit the awardee" rather than to serve the government's own needs. *United States v. Harris*, 821 F.3d 589, 603 (5th Cir. 2016).

The PPP fits squarely within this framework. It was a taxpayer-funded emergency-relief program, administered by the SBA, that distributed government-backed funds to eligible businesses struggling through a national crisis. *Supra* 6-7. That is a government benefit by any definition. And the fact that PPP loans could be forgiven (and most were) only underscores the point: These were government disbursements intended to reach eligible recipients for authorized purposes. *See Harris*, 821 F.3d at 603.

Yet the district court ignored the government-benefits rule entirely. It adopted the PSR wholesale, without any analysis of that rule or the required offsets here. And the PSR, in turn, simply accepted the government's Loss Spreadsheet—counting as "loss" the *full* disbursement amounts for all 536 flagged loans, without deducting *any* borrower's legitimate entitlement to PPP funds. That is reversible error.

And a severe one at that. Take just two examples. The Loss Spreadsheet counts the full $20,833 loan amounts issued to [redacted] and [redacted] as loss, even though both borrowers were legitimately entitled to receive some amount of PPP funds—$4,806 for [redacted], and $12,708 for [redacted]. Dkt.380 at 18. The same error almost certainly pervades many of the loans in the government's spreadsheet, given that Reis's criminal conduct primarily involved conspiring with borrowers to inflate preexisting income to get the maximum amount available for sole proprietors, rather than fabricating entire businesses or identities. *See*, *e.g.*, Dkt.336-1 at 4; Dkt.358 at 19-20. But Reis cannot quantify the full extent of the overcounting because he lacks access to the financial records needed to do so. The government, by contrast, either has those records or could easily obtain them. *Supra* 35-36.

The district court's failure to apply the government-benefits rule independently warrants reversal.

### C. The Government's Loss Figure Improperly Includes Amounts That Were Repaid

Finally, the district court committed legal error by counting as "loss" money that was, in fact, repaid—voluntarily and before any detection of fraud. The Guidelines forbid that result.

As the Commentary explains, loss must be reduced by any "money returned … by the defendant or other persons acting jointly with the defendant[] to the victim before the offense was detected." U.S.S.G. § 2B1.1 cmt. n.3(D)(i). The Guidelines

define the time of detection as "the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency." *Id.* Courts apply this "voluntary repayment" rule consistently. *See, e.g.*, *United States v. Spalding*, 894 F.3d 173, 191 (5th Cir. 2018); *United States v. Campbell*, 765 F.3d 1291, 1302 (11th Cir. 2014).

Between 2021 and 2023, Reis, Hockridge, and other borrowers voluntarily repaid at least $364,695 in loan principal to the government. Dkt.380 at 17. The government never contested those repayments or argued that they occurred after detection. Yet its Loss Spreadsheet counts those repaid dollars as "loss" anyway. *See id.* And the district court adopted that figure wholesale, without explaining why it was failing to credit repayments against the total. That was legal error.

### D. *Hebron*'s Extraordinary Burden-Shifting Framework Cannot Excuse The Government's Failures

The government has never seriously disputed that its $66 million loss figure consists of intermingled legitimate loans, amounts borrowers were legitimately entitled to receive even if their income was inflated, and voluntary repayments. Instead, its principal defense of its fraud-indicator-based methodology and refusal to apply the government-benefits rule has been this Court's decision in *United States v. Hebron*, 684 F.3d 554 (5th Cir. 2012). *See* Dkt.345 at 1-3. That decision provides that when fraud is "so extensive and pervasive that separating legitimate benefits

from fraudulent ones is not reasonably practicable," the government may treat the entire universe of claims as loss, shifting the burden to the defendant to establish which amounts were legitimate. *Hebron*, 684 F.3d at 563. This burden-shifting framework is an extraordinary departure from the normal rule that the government must prove loss by a preponderance.

Any attempt to invoke *Hebron* on appeal to defend the loss calculation fails because (1) neither the PSR nor the district court purported to apply *Hebron*, and (2) the record does not support *Hebron*'s application in any event.

### 1. The District Court Did Not Apply *Hebron*

The only way the government could be relieved of its obligations to (1) separate legitimate from illegitimate applications, and (2) offset legitimate entitlements, is if the district court made explicit factual findings that the fraud was "pervasive" and that separating legitimate from illegitimate amounts was "'impossible.'" *Hebron*, 684 F.3d at 563. Absent those findings, the default rule applies: The government bears the burden of proving loss with specificity.

The requirement of explicit findings is critical. *Hebron* authorizes an extraordinary departure from the government's ordinary burden to prove the amount of loss attributable to fraudulent or illegitimate conduct. *Id.* at 561-63. Such a drastic reallocation of the proof burden cannot be invoked by implication, assumed sub silentio, or reconstructed post hoc on appeal.

The Court has said as much, repeatedly. In *United States v. Barnes*, the Court emphasized that "the district court must first determine that a fraud is pervasive before invoking the procedures outlined in *Hebron*." 979 F.3d 283, 312 (5th Cir. 2020). In *United States v. Mesquias*, the Court underscored that this is a "crucial finding." 29 F.4th 276, 283 (5th Cir. 2022). And in *Mahmood*, the Court rejected the government's invocation of *Hebron* on appeal precisely because the district court made no "factual finding[s]" that the fraud was pervasive or too difficult to disentangle. 820 F.3d at 195-96. Because those critical findings were absent from the record, *Hebron* arguments "[we]re not relevant in th[at] appeal." *Id.* at 195.

The reason is foundational: Courts cannot affirm on alternate grounds that "depend upon findings of fact which the district court did not make." *Dubern v. Girard Tr. Bank*, 454 F.2d 565, 571 (3d Cir. 1972); *see United States v. Kaplan*, 510 F.2d 606, 612 (2d Cir. 1974) ("The decisive point now is that the findings were not made. It is not enough to suppose that the judge 'would have' or 'might have' made them.").

The record here contains none of the required findings. The district court never cited *Hebron*. It never found the fraud "pervasive." And it never determined that disaggregation was "impossible" or "impracticable." Instead, it offered only a boilerplate observation that the loss figure was "based on reliable information" and "falls within the definition of § 1B1.3(a)(1)(B) and § 2B1.1 cmt. 3(C)(i)." Dkt.385

at 3. That is not even a nod in *Hebron*'s direction, let alone an invocation of that extraordinary burden-shifting doctrine.

Nor can the PSR offer any rescue. It likewise did not cite *Hebron*, specifically find the fraud pervasive, or explain why disaggregation would be impossible. At most, a single Addendum paragraph—addressing Reis's objection that the loss amounts for 51 loans he personally processed included amounts borrowers were lawfully entitled to receive—reported that the "IRS-CID agent in charge" believed disaggregation was "too extensive." Dkt.366 at 13. But the Addendum never adopted that view as its *own* conclusion. Instead, the Addendum cited a different rationale for its refusal to offset as to the 51 loans at issue: Reis "took advantage of … economic turmoil to enrich [himself]." *Id.*[5]

In short, the requisite *Hebron* findings do not exist in this record. The government must therefore defend its $66 million loss figure on ordinary terms. For reasons discussed above, it falls far short.

### 2. The Record Does Not Support *Hebron* In Any Event

Even if the district court had invoked *Hebron*, that doctrine cannot apply on this record anyway. *Hebron* is a narrow exception, reserved for the rare case where fraud is so thoroughly interwoven with legitimate activity that any attempt to

[5] That logic is plainly incorrect. Every fraud involves intent to enrich—that is what makes it fraud. If such intent alone eliminated the right to offsets, the Guidelines' offset provisions would be superfluous.

separate the two would be genuinely "impossible"—rendered so by the defendant's own conduct. 684 F.3d at 564. The government cannot clear that high bar.

Below, the government's entire "pervasiveness" theory rested on a single data point: Karnezis's unverified assertion—made during the guilt-phase of Hockridge's trial—that "90%" of *his loans* were fraudulent. *Supra* 15. From that claim, the government argued the burden shifted to Reis to disprove the government's loss figure. Dkt.345 at 1-4. That theory fails for multiple reasons.

For starters, Karnezis's statement was not specifically addressed to the 536 loans in the spreadsheet for which the district court found $66 million in loss. Rather, it addressed the purported fraud in *his own loans*. Although there is some overlap—insofar as the spreadsheet included some of the Karnezis loans—there is no basis to conclude that his 90% statement was directed to those loans, and certainly no justification for using it to deem *other* loans fraudulent.

Nor was Karnezis credible. He was a cooperating witness and admitted serial liar who, in the very same proceedings, conceded that he had repeatedly lied to federal agents about VIPPP. *Supra* 15. Karnezis also pleaded guilty to a loss of $20-65 million, far less than 90% of the approximately $100 million in loans he processed. Dkt.336 at 11 n.9. And Reis had no opportunity to cross-examine him on this assertion—so no chance to test (1) what Karnezis meant, (2) what methodology (if any) he used to calculate that figure, (3) whether it reflected

anything more than speculation, or (4) whether it applied to the specific loans identified on the spreadsheet. *See Mesquias*, 29 F.4th at 283 (questioning district court's rejection of defendant's request for testimony at sentencing hearing).

Regardless, even if the government *could* show pervasive fraud using this single statement, *Hebron* demands more. The government must also show that separating legitimate from fraudulent is "not possible" due to the defendant's conduct. *Hebron*, 684 F.3d at 563; *see, e.g.*, *United States v. Hess*, 106 F.4th 1011, 1027 (10th Cir. 2024) (requiring that "estimating net loss [be] impossible"). In *Hebron* itself, the defendant conceded that requirement. 684 F.3d at 564.

Here, by contrast, the government has never even argued—let alone proven—that disaggregation is impossible. That failure alone forecloses reliance on *Hebron*. Indeed, the government's own conduct proves the opposite: It parsed some universe of loans, isolated 536 it deemed fraudulent, created a loan-by-loan spreadsheet categorizing each one, and conducted bank-statement and payroll analyses for just six of them. *Supra* 16-19. The government, in other words, showed how fraud could be proven, yet failed to actually do the necessary work for the vast majority of loans at issue.

Extending *Hebron* to these facts would bless a fundamental distortion of the criminal process. The government charged Reis with a $500,000 fraud, and developed its evidence accordingly. Having secured a plea to a narrow conspiracy,

the government cannot now use sentencing to obtain the punishment for a far broader fraud it never charged or proved—while invoking *Hebron* to excuse its failure to gather the necessary evidence. *Hebron* exists for the rare case where the defendant's own conduct makes separation impossible—not to let the government bootstrap a $500,000 plea into a $66 million sentence.

## II. THE LOSS AMOUNT MUST ALSO BE VACATED BECAUSE IT SWEEPS IN CONDUCT FOR WHICH REIS IS NOT RESPONSIBLE

Even if the government proved $66 million in fraud, Reis's sentence must still be vacated because the government failed to prove that Karnezis's fraud qualifies as Reis's "relevant conduct" for calculating his loss amount under the Sentencing Guidelines.

### A. The "Relevant Conduct" Inquiry Requires Individualized Attribution

The Guidelines sharply limit when the conduct of others may be treated as a defendant's "relevant conduct" to increase that defendant's punishment. Under § 1B1.3(a)(1)(B), a district court may base a defendant's sentence on others' conduct only after first making "particularized findings" that such conduct (1) falls within the scope of jointly undertaken criminal activity, (2) was in furtherance of that activity, and (3) was reasonably foreseeable to him. *United States v. Hammond*, 201 F.3d 346, 352 (5th Cir. 1999). Those findings are not optional: They are an "absolute prerequisite" to any sentence adjustment based on third-party misconduct.

*United States v. Evbuomwan*, 992 F.2d 70, 74 (5th Cir. 1993). And the government bears the burden of proving each element by a preponderance. *See United States v. Teuschler*, 689 F.3d 397, 399 (5th Cir. 2012); *United States v. Smith*, 174 F.3d 52, 57 (2d Cir. 1999) ("'The government bears the burden of proving that specified conduct is relevant to the offense of conviction.'").

Critically, "the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy." *United States v. Getto*, 729 F.3d 221, 234 n.11 (2d Cir. 2013); *see United States v. Evans*, 90 F.4th 257, 263 (4th Cir. 2024). That is because conspiracy liability and relevant conduct ask different questions. Conspiracy law is expansive: Once a defendant joins a conspiracy, he may be held liable for the acts of co-conspirators in furtherance of it. The law treats the group as a unit. The relevant conduct for sentencing, by contrast, is defendant-specific. *See* U.S.S.G. § 1B1.3 cmt. n.3(B) ("relevant conduct is not necessarily the same for every [conspiracy] participant"). It includes only those acts within the particular scope of the defendant's own joint undertaking.

This distinction between conspiracy liability and sentencing exposure has been identified by the Sentencing Commission's Chairman and General Counsel as a "key point" of the Guidelines' design. William W. Wilkins, Jr. & John R. Steer, *Relevant Conduct: The Cornerstone of the Federal Sentencing Guidelines*, 41 S.C.

L. Rev. 495, 510 (1990). Indeed, it ensures that loss-based increases in sentences track a defendant's personal culpability rather than the sheer size of the overall scheme.

### B. Karnezis's $59 Million Fraud Was Outside The Scope Of Reis's Agreement

The district court did exactly what this Court's precedents forbid: It attributed to Reis tens of millions in losses from Karnezis's conduct without making the required findings under § 1B1.3(a)(1)(B). It never determined what Reis actually agreed to undertake, and it never analyzed whether Karnezis's fraud fell within the scope of that agreement. That is reversible error.

1. Section 1B1.3 requires the sentencing court to define, with particularity, the "specific conduct" the defendant agreed to jointly undertake—and then to analyze whether the alleged co-conspirator's conduct fell within the scope of that agreement. U.S.S.G. § 1B1.3 cmt. n.3(B). The district court did neither.

Its order offered only a conclusion: that "the PSR's loss calculation only holds Defendant accountable as to the losses that fall within the definition of § 1B1.3(a)(1)(B)." Dkt.385 at 2-3. But parroting the legal standard is not a "particularized finding" establishing what Reis agreed to undertake, with whom, and to what extent. *Hammond*, 201 F.3d at 352. The district court's failure to make those findings before treating Karnezis's fraud as relevant conduct for Reis's sentencing is error. *See, e.g.*, *United States v. Smith*, 13 F.3d 860, 867-68 (5th Cir.

1994) (reversing sentence where district court did not make "specific findings" on scope before counting others' conduct as "relevant conduct"); *United States v. Bright*, 125 F.4th 97, 103 (4th Cir. 2025) (same).

Nor can that omission be patched over by reference to the PSR, given that the PSR made no such explicit findings either. This Court has squarely held that it "cannot assume that the trial court complied with § 1B1.3 by making an implicit ruling on the basis of [a] PSR's implicit finding." *Evbuomwan*, 992 F.2d at 74 (citing cases).

To justify sweeping in Karnezis's $59 million fraud, the PSR observed only that Reis trained Karnezis and that both participated in "*a* conspiracy." Dkt.366 at 3 (emphasis added). But that is merely the starting point. As discussed, conspiracy liability is not coextensive with relevant conduct for sentencing. *Supra* 50. The Guidelines demand a narrower, individualized inquiry into *what specific activities* Reis personally agreed to jointly undertake.

The PSR never performed that inquiry. At most, it stated that Reis "engaged in a jointly undertaken conspiracy to file fraudulent PPP loans with the goal of receiving the maximum disbursement allowable." Dkt.366 at 4. But that simply restates the charged offense. Section 1B1.3 does not ask for the abstract category of crime or the conspiracy's ultimate objective; it asks a narrower and more concrete question—what specific activities did this defendant agree to undertake, with whom,

and on what scale? *See, e.g.*, *United States v. Salem*, 597 F.3d 877, 888-89 (7th Cir. 2010) (reversing because district court did not "define the scope of each defendant's jointly undertaken criminal activity with sufficient clarity and specificity"); *cf.* *United States v. Mullins*, 971 F.2d 1138, 1145 (4th Cir. 1992) (rejecting similar effort to define common course of conduct "at such a level of generality as to eviscerate" the individualized relevant-conduct inquiry).

For instance, when a defendant joins a drug conspiracy, a court may not simply find that he "agreed to distribute drugs" and then attribute to him every gram every co-conspirator sold. It must make "findings" as to the specific *quantity* that fell within the scope of his agreement. *United States v. Spotted Elk*, 548 F.3d 641, 674 (8th Cir. 2008) (requiring court to find "the scope of the individual defendant's commitment" and "the foreseeability of particular drug sale amounts from the individual defendant's vantage point"). And it must determine the kinds of acts he agreed to participate in. *See, e.g.*, *Salem*, 597 F.3d at 889.

Applied here, the relevant questions are: Did Reis agree that Karnezis would fabricate payroll to obtain loans in excess of $20,000? Target active-duty military personnel as straw borrowers? Scale his fraud to $59 million—twenty times Reis's own fraud? The PSR never asked. Read charitably, it seems to have assumed that because Reis joined a conspiracy to "file fraudulent PPP loans," he thereby agreed to *every* fraudulent PPP loan any referral agent filed, in any amount, by any method,

through any channel. The Guidelines do not permit sentencing enhancements at that level of abstraction. *See, e.g.*, *Salem*, 597 F.3d at 889 (reversing when district court assumed defendant's agreement encompassed whole of conspiracy); *United States v. Khandrius*, 613 F. App'x 4, 8 (2d Cir. 2015) (same).

2. Had the PSR asked the right questions, the answers would have been obvious: These losses were *not* within the scope of any agreement between Reis and Karnezis.

Courts have identified specific factors for determining whether criminal conduct falls within the scope of a defendant's jointly undertaken activity. The Sixth Circuit has identified six: "(1) the existence of a single scheme; (2) similarities in modus operandi; (3) coordination of activities among schemers; (4) pooling of resources or profits; (5) knowledge of the scope of the scheme; and (6) length and degree of the defendant's participation." *United States v. Donadeo*, 910 F.3d 886, 897 (6th Cir. 2018). Other courts also consider "whether and to what extent the defendant benefitted from his coconspirators' criminal acts." *Spotted Elk*, 548 F.3d at 675.

Of these factors, the PSR Addendum addressed only one: knowledge of fraud. *See* Dkt.366 at 4. But knowledge of fraud is not the same as knowledge of the full scope of the scheme. And regardless, knowledge alone has never sufficed—and courts have repeatedly reversed sentences resting on that single pillar to sweep in

conduct of others. *See, e.g.*, *Khandrius*, 613 F. App'x at 7; *Hammond*, 201 F.3d at 352. Moreover, knowledge carries even less weight here, where the PPP's vulnerability to fraud was already a matter of widespread public acknowledgement. *See* Dkt.358-3 at 10-12.

The other relevant factors—each of which the district court and the government ignored—point the other way.

*First*, what Reis did and what Karnezis did were categorically different. Reis primarily helped borrowers with real businesses obtain the maximum loan amount available to sole proprietors—$20,833—by inflating their income. *Supra* 9, 14. Karnezis, by contrast, recruited networks of straw borrowers, manufactured entire fictitious companies and payroll records, and routinely sought far more than $20,000 in PPP loans. *Supra* 12-13, 18. Indeed, almost half of Karnezis's loans in the spreadsheet exceed $100,000. Dkt.358 at 26. And it was Karnezis—not Reis—who targeted active-duty military personnel for PPP loans. *See* Dkt.358 at 27 (93% of loans flagged for "military history" were registered to Karnezis).

*Second*, Reis received *nothing* from Karnezis's $59 million operation. Any borrower fee went to Karnezis and individuals in his own downstream network. Dkt.336 at 48-49. The Addendum suggested that Reis financially benefitted from Karnezis's submissions through the VIPPP pipeline to Blueacorn because, as a Blueacorn founder, he purportedly stood to gain from the fees lending institutions

paid for approved applications. Dkt.366 at 16. But the Probation Office never addressed that VIPPP's loans constituted just 0.25% of Blueacorn's overall loan volume, Dkt.336-1 at 5; Dkt.380-1 at 115; that Reis drew no salary from Blueacorn, Dkt.358 at 28; and that Reis's exit compensation was untethered to lender fees, Dkt.336 at 48; Dkt.380 at 7. And the district court said nothing about any of these points.

*Third*, Reis and Karnezis did not coordinate their activities. The PSR's sole evidence of "coordination" is that Reis initially trained Karnezis on the PPP's documentation requirements. Dkt.322-1 at 15; Dkt.366 at 3. But initial training is not ongoing coordination, and there is no evidence in the record that Reis participated in, directed, or even knew about any of the 313 loans attributed to Karnezis. *See, e.g.*, *United States v. Ekanem*, 555 F.3d 172, 176 (5th Cir. 2009) (providing "start-up and operational support" to co-conspirator insufficient to show subsequent actions part of joint undertaking). Indeed, the evidence all points the other way—Karnezis repeatedly *lied to Reis* about his conduct. *See, e.g.*, Dkt.336-1 at 7-8 (collecting record cites); *supra* 12-13 (Karnezis touting *bona fides* of contacts to Reis).

*Finally*, this was not a single scheme. Karnezis ran his own network and operation. *Supra* 12-13. He was separately indicted in Oregon—by an indictment that never referenced Reis—alongside co-conspirators who had never heard of Reis.

*Supra* 13-14. And there was evidence that Karnezis's involvement in PPP fraud predated any involvement with Reis. Dkt.329-1 at 8-9, 14.

Even the government seemed to grasp this. It excluded losses tied to Bayless Cobb (or "Rick Diamond")—Karnezis's right-hand man—from its spreadsheet. And the Addendum acknowledged that Reis "was not involved in the Rick Diamond loans." Dkt.366 at 17. That concession is significant: It acknowledges that not all downstream conduct by Karnezis was jointly undertaken with Reis. Yet the government never articulated a principled basis for the line it drew. If Cobb's fraud fell outside the scope of Reis's agreement, why did all of Karnezis's remaining fraud fall within it?

Ultimately, the government's theory requires the Court to believe that Reis agreed to join a sprawling fraud conspiracy for virtually no personal financial gain, even as he stood to earn tens of millions of dollars from his interest in an entirely legitimate company. To put the implausibility in perspective: Blueacorn was a legitimate enterprise fielding tens of thousands of loan applications daily. *Supra* 10. The notion that Reis would jeopardize this opportunity by agreeing to Karnezis's own independent scheme, when Karnezis's loans accounted for less than a *quarter of one percent* of Blueacorn's total loan volume, is implausible on its face and unsupported by any reliable evidence in this record.

* * *

Reis pleaded guilty and has accepted responsibility for his crime, just as the government fairly demanded. But at sentencing, the government took shortcut after shortcut—replacing evidence with assumptions and conflating one man's fraud with another's. Yet the government bore the burden of proof, both as to the loss amount and to Reis's culpability for Karnezis's separate conduct. The government failed to carry that burden, and a decade of Reis's life now hangs in the balance. Reis's sentence cannot stand.[6]

[6] Reis understands that Hockridge intends to raise additional issues on appeal, including a challenge to the restitution order under *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Reis fully supports those arguments, which have not been featured in his appeal due to the limited scope of the exception to his appeal waiver. ROA.2453. Nonetheless, if Hockridge prevails on those issues, Reis respectfully asks that the Court exercise its discretion to extend to him the benefit of that holding as well, as doing so would promote fairness and equal treatment of similarly situated defendants. *See, e.g.*, *United States v. Hawrylak*, No. 24-11054 (5th Cir.), ECF 70 (vacating defendant's conviction, despite his procedural default on appeal, based on reversal of co-defendant's criminal conviction implicating same legal error).

## CONCLUSION

The Court should vacate the judgment and remand for resentencing.

Dated: April 27, 2026

Respectfully submitted,

*s/ Roman Martinez*
Roman Martinez
Kevin Andrew Chambers
Christina R. Gay
Mahshad Badii
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
roman.martinez@lw.com

*Counsel for Defendant-Appellant Nathan Reis*

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2026, the foregoing redacted brief was electronically filed with the United States Court of Appeals for the Fifth Circuit through the Court's CM/ECF system. All parties are represented by registered CM/ECF users and will be served by the CM/ECF system.

*s/ Roman Martinez*
Roman Martinez

## ECF CERTIFICATION

I hereby certify (i) the required privacy redactions have been made pursuant to Rule 25.2.13; (ii) the electronic submission is an exact copy of the paper document pursuant to Rule 25.2.1; and (iii) the document has been scanned for viruses using Microsoft Defender and is free of viruses.

Dated: April 27, 2026

*s/ Roman Martinez*
Roman Martinez

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,986 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2.

This document complies with the typeface requirements and type-style requirements of Federal Rule of Appellate Procedure 32(a) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated: April 27, 2026

*s/ Roman Martinez*
Roman Martinez